IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

STEPHANIE ZIMMECK,

                Plaintiff,

v.                                      CIVIL ACTION NO.  3:13-14743

MARSHALL UNIVERSITY BOARD OF
GOVERNORS d/b/a Marshall University, Joan
C. Edwards School of Medicine,

                Defendant.

MEMORANDUM OPINION

On April 28, 2015 the Court issued an order granting Defendant's Motion for Summary

Judgment (ECF No. 105) and denying as moot Defendant's Motion to Exclude Evidence of David

M. Marks, M.D.'s Expert Opinions (ECF No. 102).  This memorandum opinion sets out the

reasons for those rulings.

I.       Background

Plaintiff Stephanie Zimmeck enrolled in the Marshal University School of Medicine

(MUSOM) in Huntington, West Virginia in the fall of 2009.  MUSOM evaluates its students'

level of professionalism each semester during their first and second years.  ECF No. 105, Ex. 3.

In October of her first semester at MUSOM Plaintiff was evaluated and informed that she did not

"meet the standard for professionalism."  ECF No. 105, Ex. 2.  The evaluation form noted that

she was consistently late and disruptive.  *Id.*  Furthermore, it indicated that Plaintiff failed to

follow up with the faculty to discuss their concerns over her professionalism.  *Id.*  In December,

2009 Plaintiff was again evaluated and was again told that she did not meet the standard for

professionalism.   *Id.*   According to MUSOM's records, Plaintiff again failed to follow up with the faculty, leading Dr. Veitia, the associate dean, to file a critical incident report regarding Plaintiff's behavior.   *Id.*   In February, 2010 Plaintiff met with Dr. Veitia to discuss the issues with her professional behavior.   She told Dr. Veitia that she had been feeling sad and isolated and was not coping well with living in Huntington.   ECF No. 105, Ex. 8.   Dr. Veitia asked Plaintiff if she had considered receiving treatment for depression.   *Id.*   According to Plaintiff's testimony, she told Dr. Veitia that she did not think she was depressed.   *Id.*

On her next two evaluations, in May and December, 2010, Plaintiff was informed that she was meeting the expected standards for professionalism and had improved her communication with the faculty.   *Id.*   Her final evaluation in June, 2011 again indicated that Plaintiff did not meet the standard for professionalism.   *Id.*   At this time Plaintiff also received a second critical incident report as a result of her failure to sit for a required exam.   *Id.*

During the summer of 2011 Plaintiff saw her physician, Dr. Filak.   Dr. Filak noted that Plaintiff presented with depression and prescribed her an antidepressant medication called Lexapro.   ECF No. 107, Ex. 2.   In the fall Plaintiff returned for her third year.   At the beginning of the semester, MUSOM's Academic & Professionalism Standards Committee met with Plaintiff to discuss concerns with her academic and professional progress in the medical school program. *Id.*   The Committee then sent Plaintiff a letter indicating that it would review her professionalism at the close of her third year, but also reserved the right to review her progress at any time.   *Id.* During her third-year clerkship rotations, the director of MUSOM's clerkship program, Dr. Bolkhir, received numerous reports and emails concerning Plaintiff's behavior from doctors, nurses, and other staff members.   ECF No. 105, Ex. 1 & Ex. 2.   Faculty and staff stated that

Plaintiff was tardy, dressed inappropriately, made unsettling comments to patients, failed to follow directions, interrupted her teachers, and ran through the hallways.   ECF No. 105, Ex. 1 & Ex. 2. Dr. Bolkhir emailed Plaintiff to discuss these concerns.   ECF No. 105, Ex. 1.   She responded "I quit."   ECF No. 105, Ex. 1.   Plaintiff later testified that this email was intended to be a suicide note.   ECF No. 105, Ex. 8.   At this time Plaintiff met with a psychologist, Dr. Linz.   She also decided to taper off of Lexapro.

Dr. Bolkhir continued to receive reports about Plaintiff's behavior throughout the fall semester.   Dr. Bolkhir contacted Dr. LeGrow, Associate Dean of Academic Affairs, who then met with Plaintiff.   ECF No. 105, Ex. 7.   Plaintiff told Dr. LeGrow that she was depressed and was seeing a therapist.   *Id.*   She also said that at times she had felt suicidal.   *Id.*   Dr. LeGrow offered to help Plaintiff receive treatment at a hospital but she refused.   Plaintiff asked Dr. LeGrow to allow her to continue her third-year rotations.   ECF No. 105, Ex. 8.   Although Plaintiff was permitted to return to rotations with a remediation plan, she received a third critical incident report as a result of her continued lapses in professionalism.   ECF No. 105, Ex. 1.

In December, 2011, the Academic & Professionalism Standards Committee reviewed Plaintiff's third critical incident report and recommended that she be dismissed from the medical school.   ECF No. 105, Ex. 1.   Plaintiff appealed to the Appeals Sub-Committee of the Dean's Advisory Committee.   *Id.*   In her letter of appeal, Plaintiff admitted to behaving illogically and inappropriately.   *Id.*   She stated that her behavior was the result of side effects from Lexapro. *Id.*   She also indicated that she had intended to kill herself after her initial meeting with the Academic & Professionalism Standards Committee.   *Id.*   Plaintiff further stated that after she tapered off Lexapro, she could see that she had made mistakes and was embarrassed by her bizarre

behavior.  *Id.*    Plaintiff admitted that she had not previously mentioned the side effects of Lexapro in her meetings with MUSOM faculty, stating "I chose not to disclose this information." *Id.*    She concluded by requesting that she be permitted to complete her rotations under the remediation plan she created with Dr. Bolkhir.  *Id.*    Plaintiff's appeal was denied.  *Id.*    She then met with Dean Robert Nerhood, the final step in the appeals process.  *Id.*    In January, 2012, Dr. Nerhood made his final decision to deny Plaintiff's appeal.  *Id.*    Plaintiff was accordingly dismissed from MUSOM.  *Id.*

## II.      Standard of Review

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).   Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor."  *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   The nonmoving party must satisfy this burden of proof by offering more than a mere

"scintilla of evidence" in support of his or her position.   *Anderson*, 477 U.S. at 252.

### III.      Discussion

Plaintiff's second amended complaint raises two causes of action.   First, she alleges that Defendant retaliated and discriminated against her in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act").   ECF No. 48.   Second, she alleges that Defendant retaliated and discriminated against her in violation of the Americans with Disabilities Act ("ADA").   ECF No. 48.   The elements for Plaintiff's claims under the Rehabilitation Act and the ADA are almost identical.   For this reason, the Court will first discuss Plaintiff's claims for retaliation under both statutes and then examine the claims for discrimination under both statutes.

#### A.  Retaliation Under the Rehabilitation Act and ADA

The ADA prohibits persons and entities from retaliating against an individual who engages in activity protected by the ADA.   42 U.S.C. § 12203 (2012).   To state a claim for retaliation, a Plaintiff must prove "(1) that she has engaged in conduct protected by the ADA; (2) that she suffered an adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal link between the protected activity and the adverse action."   *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002)**.**   The same elements apply to a claim for retaliation under the Rehabilitation Act.   *See Hooven–Lewis v. Caldera*, 249 F.3d 259, 271-72 (4th Cir. 2001).

The Court need not address whether Plaintiff engaged in conduct protected by the acts because she has failed to produce sufficient evidence to raise a triable issue of material fact as to the second and third elements her retaliation claims.   First, Plaintiff has not presented any evidence that she engaged in conduct protected by the ADA or Rehabilitation Act *before* she was

terminated from MUSOM.   Although Plaintiff failed to address her retaliation claim in the Proposed Integrated Pretrial Order and her response to Defendant's motion for summary judgment, she nonetheless argued during the pretrial conference that she was dismissed in retaliation for raising with MUSOM the issue of her depression.   This argument is not supported by the evidence.   Rather, it appears that Plaintiff did not even inform MUSOM of her alleged disabilities until after the initial decision to terminate her.   *See* ECF No. 105, Ex. 1.

Moreover, Plaintiff has failed to demonstrate any causal connection between her alleged protected activity and the school's decision to expel her.   She argues that because she suffered from depression and the side effects of Lexapro, MUSOM did not want to deal with her as a student.   Plaintiff has not put forth any evidence to support this argument.   Accordingly, the second and third elements of Plaintiff's retaliation claim are unsupported by the evidence and her claim cannot survive summary judgment.

### B.  Discrimination Under the Rehabilitation Act and ADA

The Rehabilitation Act and ADA provide that no individual with a disability may be excluded from participation, by reason of her disability, in a program such as the medical school program at MUSOM.   *See* 29 U.S.C. § 794 (2012); 42 U.S.C. § 12132 (2012); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).   To recover under either statute, a plaintiff must show: "(1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability."   *Constantine*, 411 F.3d at 498.

A disability is "a physical or mental impairment that substantially limits one or more major life activities" or "a record of such an impairment" or "being regarded as having such an impairment."  29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(1)(A).  Here, the Court need not determine whether Plaintiff has demonstrated that she suffers from a disability because she has not raised a genuine issue of material fact as to the second and third elements of her claims for discrimination.[1]

Turning to the second element, a plaintiff is "otherwise qualified" for a program if she "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for" participation in the program.  42 U.S.C. § 12131(2).  To show that she is otherwise qualified, a plaintiff must demonstrate that she "could satisfy the essential eligibility requirements of the program" at issue, or, if she could not, that a "reasonable accommodation" by the defendant would allow her to meet these requirements.  *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 (4th Cir. 2012).  In general, courts accord deference to a school's professional judgment as to whether a student can satisfy the school's essential eligibility requirements.  *Id.* at 463.

Plaintiff has not adduced sufficient evidence demonstrating that she was otherwise qualified for the medical school program at MUSOM.  First, MUSOM's professionalism standards are an essential aspect of eligibility for the medical school program.  ECF No. 105, Ex. 2; *see Halpern*, 669 F.3d at 463 (finding professionalism an essential aspect of eligibility for

---

[1] As the Court finds no need to determine whether Plaintiff has a qualifying disability, the admissibility of Dr. Marks's opinions as to Plaintiff's disabilities is a moot issue.  Defendant's motion to exclude Dr. Marks's expert opinions has thus been denied as moot.

medical school where professionalism was goal of program and student handbook explained professionalism expectations).  The school's Policy Regarding Academic and Professionalism Standards, Leaves and Appeals states that medical students are required to uphold the standards of professionalism expected of physicians.  ECF No. 105, Ex. 3.  The policy then explains in significant detail MUSOM's specific professionalism expectations and its method for evaluating students' professionalism each semester.  ECF No. 105, Ex. 3.  Furthermore, Plaintiff received and signed several acknowledgments explaining MUSOM's policies concerning professionalism. ECF No. 105, Ex. 2.  One such acknowledgement indicated that "breeches in . . . professional behavior" could lead to dismissal from the medical school.  ECF No. 105, Ex. 2.  It is clear from these materials that professionalism is an essential aspect of MUSOM's program.

Second, as explained in Plaintiff's notice of dismissal, MUSOM determined that Plaintiff did not meet the school's professionalism standards.  ECF No. 105, Ex. 1.  MUSOM's determination is well supported by emails, letters, and incident reports detailing Plaintiff's unprofessional conduct in the classroom and the clinical setting.  *See* ECF No. 105, Ex. 1 & Ex. 3. Furthermore, Plaintiff's own deposition testimony reinforces the conclusion that she did not satisfy MUSOM's professionalism requirements.  Plaintiff testified that her behavior was not acceptable for a medical student and that she should not have been treating patients.  ECF No. 105, Ex. 8.  She also testified that during her time at MUSOM she was not thinking rationally and was "not mentally stable."  ECF No. 105, Ex. 8.  Furthermore, she admits that she did not respond to her professor's concerns in a rational manner.  ECF No. 105, Ex. 8.  Thus Plaintiff has not presented any evidence that, without accommodation, she was able to meet MUSOM's professionalism expectations.

Finally, Plaintiff has not shown that with reasonable accommodation, she could have met MUSOM's professionalism standards. "Federal law mandates that federal grantees and public accommodations make 'reasonable,' but not 'substantial' or 'fundamental' modifications to accommodate persons with disabilities." *Halpern*, 669 F.3d at 464.   Although determining whether a modification is reasonable is "often fact-specific, a court may grant summary judgment in favor of a defendant if the plaintiff fails to present evidence from which a jury may infer that the accommodation is 'reasonable on its face.'" *Id.* (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002)).   As MUSOM's professionalism standards are an essential eligibility requirement of the program, changing or lessening those standards for Plaintiff would not be a reasonable accommodation. *See id.* ("[T]he requirement that students demonstrate professional behavior is an essential aspect of Wake Forest's Doctor of Medicine program.  Accordingly, Halpern could not reasonably seek to avoid or lessen the professionalism requirement.").   Rather, Plaintiff must demonstrate that she timely notified the school of her disability and proposed a specific, reasonable accommodation that would allow her to meet MUSOM's existing professionalism requirements. *See id.*

As the court in *Halpern v. Wake Forest University Health Sciences* explained, a school has no duty to provide an accommodation until the student proposes one. *See id.* at 465. Furthermore, "the law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability." *Id.*  If the student does not inform the school of her disability and need for accommodation in a timely manner, the school may reasonably dismiss her based on observed misconduct, even if the school later learns that the misconduct was the manifestation of a disability. *Id.*  In *Halpern*, a medical student was

dismissed after repeated incidents of tardiness and unprofessional behavior. *Id.* at 458. On appeal of the school's decision, Mr. Halpern claimed that ADHD had caused his behavior and requested that the school implement a remediation plan to accommodate his disability. *Id.* at 459. The district court granted summary judgment for the school and the U.S. Court of Appeals for the Fourth Circuit affirmed, explaining: "By the time Halpern requested that the Medical School implement his special remediation plan, he had already engaged in numerous unprofessional acts that warranted his dismissal . . . Thus, Halpern sought not a disability accommodation, but 'a second chance to better control [his] treatable medical condition.'" *Id.* at 465 (quoting *Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir.1999)).

Similarly, Plaintiff here did not inform MUSOM of her alleged disabilities until after the initial decision to dismiss her. *See* ECF No. 105, Ex. 1. Moreover, she never requested a specific accommodation. ECF No. 105, Ex. 8. Instead, she argues that the school should have known she was exhibiting signs of depression or a mood disorder and should have implemented its policy for impaired students. Plaintiff tries to shift the burden of identifying a disability and an appropriate accommodation onto the defendant. This, however, is the student's responsibility. Moreover, it is the Plaintiff's burden to provide more than a scintilla of evidence for her conclusion that she requested a reasonable accommodation and could meet MUSOM's standards if granted such an accommodation. She has failed to meet this burden. Plaintiff therefore has not raised a triable issue of fact as to the second element of her discrimination claims.

Whereas the first two elements of Plaintiff's claims are identical under the Rehabilitation Act and ADA, different showings are required to satisfy the third element under each statute. *Baird v. Rose*, 192 F.3d 462, 469 (4th Cir.1999). Under the Rehabilitation Act, a plaintiff must

show that she was excluded solely because of her disability.  *Halpern*, 669 F.3d at 461-62.   The

ADA "requires only that the disability was 'a motivating cause' of the exclusion."  *Id.* (quoting

*Baird*, 192 F.3d at 468-69).   Here, Plaintiff has not presented adequate evidence to raise a genuine

issue of fact under either standard.

In *Halpern*, the Fourth Circuit held that "'misconduct—even misconduct related to a

disability—is not itself a disability' and may be a basis for dismissal.  *Id. at* 465 (quoting

*Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 n. 3 (4th Cir.1997)).   "Where a professional

school has reasonably determined based on an identifiable pattern of prior conduct that a student is

unfit to join his chosen profession, federal law does not obligate the school to allow that student to

remain in and graduate from its educational program."  *Id.* at 466-67.   The court noted that Mr.

Halpern's conduct was continuously unprofessional, despite attempts by the medical school

faculty to address his behavioral problems.   The court held that, even though he later claimed they

were caused by a disability, Mr. Halpern's lapses provided a reasonable basis on which to dismiss

him.  *Id.* at 466.

The present case is quite similar to that of Mr. Halpern.   As previously noted, Plaintiff did

not inform MUSOM of her alleged disabilities until after her dismissal.   ECF No. 105, Ex. 1.

She has presented evidence that she spoke of her symptoms to two members of the MUSOM

faculty, but this alone is not enough to support her conclusion that the Academic &

Professionalism Standards Committee knew of her alleged disabilities and decided to dismiss her

from the medical school based on that knowledge.   Instead, all evidence before the Court

indicates that Plaintiff was dismissed due to her repeated failure to meet the school's

professionalism requirements throughout her time at MUSOM, despite the school's efforts to help

her.  *See* ECF No. 105, Ex. 1 & Ex. 3; *Halpern*, 669 F.3d at 466.   That Plaintiff subsequently disclosed her alleged disabilities does not make MUSOM's decision discriminatory.   Plaintiff's claims for discrimination thus cannot survive summary judgment.

## I.        Conclusion

For the reasons set forth above, the Court has granted Defendant's Motion for Summary Judgment (ECF No. 105) and denied as moot Defendant's Motion to Exclude Evidence of David M. Marks, M.D.'s Expert Opinions (ECF No. 102).   The Court **DIRECTS** the Clerk to send a copy of this written Opinion to counsel of record and any unrepresented parties.


ENTER:        May 6, 2015


ROBERT C. CHAMBERS, CHIEF JUDGE